## J. E. HUFF V. STATE.

No. 25263. May 2, 1951.
Rehearing Denied June 13, 1951.

Hon. W. A. Lunsford, Judge Presiding.

*Wilson & Prothro,* Tyler, for appellant.

*George P. Blackburn,* State's Attorney, Austin, for the state.

DAVIDSON, Judge.

Cabell's, Incorporated, of Dallas, Texas, is engaged in the business of producing, processing, selling and delivering milk and milk products, at wholesale. The appellant is a "route driver" for the company and, as such driver and representative, did, on the 25th day of July, 1950, sell to H. A. Barnett, a retail merchant at Gilmer, in Upshur County, Texas, six quarts of buttermilk in containers having four sides. The printing upon each

side of the containers represented the contents thereof to be, among other things, "churned buttermilk."

The state contends that the content of the containers was not "churned buttermilk," as represented, but was "cultured buttermilk."

Appellant was by information charged with selling a misbranded article of food, by reason of the facts stated and, upon trial to the court, was convicted and his punishment assessed at a fine of $50.

The two terms, articles of food, "buttermilk" and "cultured buttermilk," are defined by statute.

Buttermilk is the product which remains when fat is removed from milk or cream in the process of churning. It contains not less than eight per cent (8%) of milk solids-not-fat. Art 165-3, Section 1, Subdivision (G), Vernon's Revised Civil Statutes.

Cultured buttermilk is the product resulting from the souring or treatment, by a lactic acid culture, of milk or milk products. It contains not less than eight per cent (8%) of milk-solids-not-fat, and shall be pasteurized before adding the culture. Art. 165-3, Section 1, Subdivision (H), Vernon's Revised Civil Statutes.

The distinction between the two articles of food is apparent. One is obtained by a process of churning, while the other is the result of treatment by a lactic acid culture. So long, therefore, as a lactic acid culture treatment is used, the product could not be buttermilk produced by a process of churning nor churned buttermilk.

The undisputed evidence shows that the product here sold was produced by the following process:

"Grade 'A' skim milk, raw or pasteurized and/or Grade 'A' Condensed skim milk, are pasteurized at a temperature of 190 degrees F. and held there for one hour in a specially constructed, approved, stainless steel pasteurized cooler-container. After pacteurization, the milk is cooled while still in the equipment aforementioned, to what is known as incubating temperature, or approximately 72 degrees. At this temperature, a certain amount of 'starter' is added in order to start and accelerate the process

of souring or clabbering. At intervals of approximately 30 days, a batch of starter is made by introducing a lactic acid culture into skim milk. This starter is used to start the souring of the first batch of milk to be sold. A portion of this batch is then used in the succeeding batch and so on throughout said period.

"This clabbering process takes approximately twelve hours, and when completed the milk is thoroughly agitated. This agitation, still within the original vat, is accomplished by a high speed agitator, and a system of baffles made into the vat so beating up this curd or clabber that a smooth product is obtained. When this agitation process has been completed, cold water is pumped through the jacket surrounding the vat until the temperature of the contents is cooled sufficiently for bottling.

"It is then conveyed by means of stainless steel approved pipe lines to the bottle and carton fillers where bottles and cartons of varying sizes and types are filled and sealed for delivery to the ultimate consumer. All of the raw materials used are from approved sources, and of approved quality, and all of the equipment used is approved by the various Health Departments, as well as the U. S. Public Health Service. The equipment so used is not the type that would be used in the commercial churning of cream for the butter market, but is designed for the production of a type or form of buttermilk processed as above stated as a major product."

Counsel for appellant, in open court, agreed that the type or form of buttermilk sold by the appellant was of "comparatively light, or thin body, and of a low lactic acid content."

The undisputed evidence, showing that the product here sold was produced by a starter which was made "by introducing a lactic acid culture into skim milk" and was of "the type or form of buttermilk sold by the defendant" and of "comparatively light, or thin body, and of a low lactic acid content," authorized the trial court's conclusion that the article of food so sold was cultured buttermilk and could not, therefore, be churned buttermilk.

The judgment is affirmed.

Opinion approved by the court.

ON APPELLANT'S MOTION FOR REHEARING.

WOODLEY, Judge.

Appellant has presented us with a most able brief in which he contends that a variance exists between the definitions of buttermilk and cultured buttermilk as made by the legislature in Sec. 1 of Art. 165-3, Vernon's R.C.S., and the definition promulgated by the State Health Officer on March 1, 1942, under and by virtue of Sec. 2 of said Art. 165-3.

Such variance is not to us apparent. It appears that the statute differentiates between the product which remains when fat is removed from milk or cream in the process of churning and that resulting from the souring or treatment by a lactic acid culture of milk or milk products. This distinction was recognized by the State Health Officer in defining buttermilk.

We remain convinced that appellant labeled his product as one type of buttermilk when in fact it was the other.

Appellant's motion for rehearing is therefore overruled.

Opinion approved by the court.